# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

|  |  |
|---|---|
| D.H., a Minor, By and Through Kaitlin Holland, As Parent and Natural Guardian, | |
| Plaintiff, | **COMPLAINT FOR DAMAGES** |
| vs. | **DEMAND FOR JURY TRIAL** |
| Beech-Nut Nutrition Company; Gerber Products Company; Hain Celestial Group, Inc.; Plum, PBC; The Campbell's Company; and Walmart, Inc. | |
| Defendants. | |

Plaintiff, D.H., a Minor, By and Through Kaitlin Holland, As Parent and Natural Guardian, by and through undersigned counsel, brings this civil action against Defendants Beech-Nut Nutrition Company; Gerber Products Company; Hain Celestial Group, Inc.; Plum, PBC; The Campbell's Company; and Walmart, Inc. (collectively, "Defendants") for personal injuries and sequalae thereof caused by Defendants' manufacturer and sale of contaminated baby foods with dangerous levels of toxic heavy metals. Plaintiff makes the following allegations upon personal knowledge as to their own actions, upon information and belief, and their attorneys' investigation as to all other matters, and alleges as follows:

1

## INTRODUCTION

1.      Defendants, manufacturers and retailers of baby foods, *knowingly* sold baby food products contaminated with dangerous levels of lead and arsenic (collectively, "Toxic Heavy Metals"). Defendants sold these baby foods knowing that Toxic Heavy Metals, when consumed by babies, are known to cause brain damage and neurodevelopmental harm.

2.      To the extent Defendants sold baby food that contained detectible amounts of Toxic Heavy Metals (collectively, "Contaminated Baby Foods") those products were defective in their manufacture, design, advertising, distribution, labeling, and marketing.

3.      Babies are the most vulnerable segment of the population, and they rely on baby food products for healthy neurodevelopment. Defendants justify their callous disregard for the welfare of babies because, until recently, there were no regulations governing the presence of Toxic Heavy Metals in baby foods—and, because there were no regulations, they were free to do as they pleased.

4.      Baby food *should* be safe. It should *not* be contaminated with Toxic Heavy Metals. Period. This action aims to stop Defendants from poisoning infants with Contaminated Baby Food. By sourcing ingredients from farms that have non-detectable levels of heavy metal (using sufficiently sensitive testing), avoiding certain ingredients all together, and systematically testing and screening finished

products for Toxic Heavy Metals *before* the foods are released for consumption, these Defendants would be able to provide baby food products free of detectable levels of Toxic Heavy Metals. And, if some levels are truly unavoidable, or if Defendants believe the identified levels are safe, then, at the very least, Defendants must warn parents/guardians/caregivers about the presence of these Toxic Heavy Metals so they can make informed decisions about what they are feeding their baby. Anything short of proper design, manufacture, and warning, is unacceptable—especially for an industry that touts itself as providing the most important sources of neurodevelopment for the most vulnerable population of society.

5.    Plaintiff D.H., a Minor, By and Through Kaitlin Holland, As Parent and Natural Guardian ("Plaintiff"), represented in this lawsuit by his parent, is a 7-year-old child who lives with debilitating brain injury, namely in the form of the neurodevelopmental disorder autism spectrum disorder ("ASD") and related *sequalae* because, as an infant, his consumed Contaminated Baby Foods manufactured and sold by Defendants. Plaintiff's parent was never warned that Defendants' food contained Toxic Heavy Metals and, thus, was never able to make an informed decision about whether to feed their baby Defendants Contaminated Baby Foods. The consequences are stark—there is an unprecedented epidemic of ASD and attention deficit hyperactivity disorder ("ADHD") spreading throughout

the American population. Driven, in part, by the systematic neurodevelopmental poisoning of infants from Defendants' Contaminated Baby Foods.

6.    Plaintiff seeks to hold Defendants accountable for their misconduct by compensating Plaintiff for the harm caused by Defendants Contaminated Baby Foods, and ensure that each Defendant is punished to deter such misconduct in the future.

## PARTIES

### I.    Plaintiff

7.    At all relevant times hereto, Plaintiff was and is a resident and citizen of the State of Florida.

8.    Plaintiff lives with brain injuries and neurodevelopmental harm caused by exposure to Defendants' Contaminated Baby Foods, which was manifested in a diagnosis of ASD.

9.    As a direct and proximate result of Plaintiff's exposure to Toxic Heavy Metals from consumption of Defendants' Contaminated Baby Foods, Plaintiff suffered significant harm, conscious pain and suffering, physical injury and bodily impairment, including, but not limited to, brain injury manifesting as the neurodevelopmental disorders ASD, other permanent physical deficits, permanent bodily impairment, and other sequelae. Plaintiff's injuries required medical intervention to address the adverse neurological effects and damage

4

caused by exposure to Toxic Heavy Metals in Defendants' Contaminated Baby Foods. Additionally, Plaintiff has suffered severe mental and physical pain, including, but not limited to, pain, mental suffering, loss of enjoyment of life, disfigurement, physical impairment, inconvenience, grief, anxiety, humiliation, and emotional distress and have and will sustain such injuries, along with economic loss due to medical expenses and living-related expenses as a result of lifestyle changes, into the future, as determined by the trier of fact.

10.     The product warnings for the Contaminated Baby Foods in effect during the time period Plaintiff consumed the Contaminated Baby Foods were non-existent, vague, incomplete, and/or otherwise inadequate, both substantively and graphically, to alert consumers to the presence of Toxic Heavy Metals in the Contaminated Baby Foods and/or the potentially severe health risks associated with Toxic Heavy Metal exposure in babies. Thus, each Defendant did not provide adequate warnings to consumers including Plaintiff, his parent, and the general public about the presence of Toxic Heavy Metals in the Contaminated Baby Foods consumed by Plaintiff and the potential risk of serious adverse events associated with Toxic Heavy Metal exposure in infancy.

11.     Had Plaintiff or his parent been adequately warned by Defendants of the potential for exposure to Toxic Heavy Metals from consumption of Defendants' Contaminated Baby Foods and/or the potential for such exposure to

5

result in harm, Plaintiff or his parent would not have purchased, used, and/or consumed Contaminated Baby Foods or would have taken other steps to potentially mitigate the harm caused by exposing a baby to Toxic Heavy Metals.

## II.    Defendants

12.    Defendant Beech-Nut Nutrition Company ("Beech-Nut") is a citizen of Delaware and New York with its principal place of business located at 1 Nutritious Pl., Amsterdam, NY 12010. Beech-Nut sells baby foods under the brand name Beech-Nut. Beech-Nut produces baby foods aimed at infants 4+ months up to 12+ months and includes a variety of cereals, "jars", and "pouches" for these age groups. At all relevant times, Beech-Nut has conducted business and derived substantial revenue from its manufacturing, advertising, distributing, selling, and marketing of Contaminated Baby Foods throughout the United States and within the State of Florida.

13.    Defendant Gerber Products Company ("Gerber") is a citizen of Michigan and Virginia with its principal place of business located at 1812 N. Moore Street, Arlington, Virginia 22209. Gerber sells baby foods under the brand name Gerber. Gerber organizes its products into broad categories of "formula," "baby cereal," "baby food," "snacks," "meals & sides," "beverages," and "organic." At all relevant times, Gerber has conducted business and derived substantial revenue from its manufacturing, labeling, advertising, distributing, selling, and

6

marketing of Contaminated Baby Foods throughout the United States and within the State of Florida.

14.    Defendant Hain Celestial Group, Inc. ("Hain") is a citizen of Delaware and New York with its principal place of business located at 1111 Marcus Ave., Lake Success, NY 11042. Hain sells baby foods under the brand name Earth's Best Organics. Hain offers infant and baby formula and foods as well as toddler foods covering products from "organic infant cereal" to "organic snacks for toddlers and kids on the go". At all relevant times, Hain has conducted business and derived substantial revenue from its manufacturing, advertising, distributing, selling, and marketing of Contaminated Baby Foods throughout the United States and within the State of Florida.

15.    Defendant Plum, PBC ("Plum") is a citizen of Delaware and California with its principal place of business located at 6795 N. Palm Ave., 2nd Floor, Fresno, CA 93704. Plum has sold baby foods under the brand name Plum Organics since 2007. Starting June 12, 2013, and until May 3, 2021, Plum was directly controlled and owned by Defendant Campbell. Plum's products are divided into groups according to the targeted infant or toddler age and/or type of food product. For example, there are five groups designated for the youngest infants: Stage 1 (4+ months old), Stage 2 (6+ months old), Stage 3 (6+ months old), "Super Puffs," and "Little Teethers." At all relevant times, Plum has

conducted business and derived substantial revenue from its manufacturing, advertising, distributing, selling, and marketing of Contaminated Baby Foods throughout the United States and within the State of Florida.

16.    Defendant The Campbell Company ("Campbell") is a citizen of New Jersey with its principal place of business located at One Campbell Pl., Camden, New Jersey 08103. Campbell sells food and beverages and was the parent company of Plum until May 3, 2021. Campbell sold baby food under the brand name Plum Organics through Plum. At all relevant times, Campbell has conducted business and derived substantial revenue from its manufacturing, advertising, distributing, selling, and marketing of Contaminated Baby Foods throughout the United States and within the State of Florida.

17.    Defendant Walmart, Inc. ("Walmart") is a citizen of Delaware and Arkansas with its principal place of business located at 702 S.W. 8th St. Bentonville, Arkansas 72716. Walmart sells Baby Foods under the private label brand "Parent's Choice." The foods are manufactured by co-manufacturers, but are sold under Walmart's private label using Walmart's name. Walmart's Parent's Choice offers a wide selection of baby foods ranging from "sweet potatoes & corn" to "toddler cookies" and "yogurt bites." At all relevant times, Walmart has conducted business and derived substantial revenue from its manufacturing, advertising, distributing, selling, and marketing of Contaminated Baby Foods

8

throughout the United States and within the State of Florida.

## JURISDICTION AND VENUE

18.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because Plaintiff is a citizen of a state other than states where Defendants are citizens. Additionally, Plaintiff seeks damages in excess of $75,000, exclusive of interest and costs.

19.   This Court has personal jurisdiction over all Defendants because each Defendant regularly conducts business in the State of Florida and insofar as Defendants are authorized and licensed to conduct business in the State of Florida, maintain and carry on systemic and continuous contacts in this judicial district, regularly transact business within this judicial district, and regularly avail themselves of the benefits of this judicial district.

20.   Additionally, Defendants caused tortious injury by acts and omissions in this judicial district and caused tortious injury in this district by acts and omissions outside this district while regularly doing and soliciting business, engaging in a persistent course of conduct, and deriving substantial revenue from goods used or consumed and services rendered in this judicial district.

21.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claim occurred in this district.

**FACTUAL ALLEGATIONS**

I.     **Rising Concerns Regarding the Presence of Toxic Heavy Metals in Baby Foods**

22.     In October 2019, an alliance of nonprofit organizations, scientists and donors named "Happy Babies Bright Futures" ("HBBF"), dedicated to designing and implementing outcomes-based programs that "measurably reduces the largest sources of babies' exposures to toxic chemicals,"[1] published a report investigating the presence of Toxic Heavy Metals in baby foods.[2] The HBBF Report tested 168 different baby foods sold on the U.S. market and concluded that "[n]inety-five percent of baby foods tested were contaminated with the toxic heavy metals arsenic and lead, among others. All but nine of 168 baby foods contained at least one metal; most contained more than one."[3] Specifically, the HBBF report identified "puffs and other snacks made with rice flour," "[t]eething biscuits and rice rusks," "infant rice cereal," "apple, pear, grape and other fruit juices," and "carrots and sweet potatoes" manufactured by Defendants as particularly high in Toxic Heavy Metals.[4]

23.     The results of the HBBF report were consistent with that of the U.S. Food and Drug Administration ("FDA") which had, in 2017, detected one or more

---

[1] Healthy Babies Bright Futures, *Solutions*, HBBF, https://hbbf.org/ (last visited February 9, 2026).

[2] Jane Houlihan, *What's in my baby's food? A national investigation finds 95 percent of baby foods tested contain toxic chemicals that lower baby's IQ, including arsenic and lead* (Oct. 2019) https://hbbf.org/sites/default/files/2022-12/BabyFoodReport_ENGLISH_R6_0.pdf.

[3] *Id*. at 6.

[4] *Id*. at 10-11.

toxic heavy metals in 33 of 39 types of baby food tested.[5]  However, the HBBF reported that "[f]or 88 percent of baby foods tested by HBBF—148 of 168 baby foods—FDA has failed to set enforceable limits or issue guidance on maximum safe amounts."[6]  The HBBF's findings were by no means an outlier.  Eight months prior to publication of the HBBF report, a study conducted by scientists at the University of Miami and the Clean Label Project "examined lead…concentrations in a large convenience sample of US baby foods."[7]  The study detected lead in 37% of samples.[8]

24.      Moreover, earlier in 2017, HBBF commissioned a study to evaluate the presence of arsenic in infant rice cereal products sold in the U.S., and the potential risks to children's neurodevelopment posed by contamination levels.[9]  The findings were concerning.  The authors concluded that arsenic exposure from infant rice cereal approaches or exceeds existing health-based limits for arsenic levels and may place infants at risk for adverse health effects.[10]

---

[5] *Id*. at 6.

[6] *Id*. at 6.

[7] Gardener, et al., *Lead and cadmium contamination in a large sample of United States infant formulas and baby foods*, 651 SCI. TOTAL ENVIRON. 1, 822-827 (February 15, 2019) https://www.sciencedirect.com/science/article/abs/pii/S0048969718334442?via%3Dihub.

[8] *Id*.

[9] *See* Jane Houlihan, *Arsenic in 9 Brands of Infant Cereal. A national survey of arsenic contamination in 105 cereals from leading brands. Including best choices for parents, manufacturers and retailers seeking healthy options for infants.* (Dec. 2017) https://hbbf.org/sites/default/files/2022-12/HBBF_ArsenicInInfantCerealReport_0.pdf.

[10] *Id*.

## II.   Congressional Investigation Finds Substantial Presence of Heavy Metals in Baby Foods Manufactured and/or Sold by Defendants.

25.   On February 4, 2021, and September 29, 2021, respectively, the U.S. House of Representatives' Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform, published two reports detailing its findings that Toxic Heavy Metals—including arsenic and lead—were present in "significant levels" in numerous commercial baby food products.[11] Four companies—Hain, Gerber, Nurture, and Beech-Nut—produced internal testing policies, test results for ingredients and finished products, and documentation about what the companies did with ingredients and/or finished products that exceeded their internal testing limits. Three companies—Plum (Campbell), Walmart, and Sprout—initially refused to cooperate.[12]

26.   Congress reported that the data submitted by the companies unequivocally revealed that a substantial number of Defendants' finished products and/or ingredients used to manufacture the baby foods are tainted with Toxic Heavy Metals, namely arsenic and lead.[13] And, where Defendants did set internal limits for the amount of metals they allowed in their foods, Defendants routinely flouted their

---

[11] Staff Report, H.R. Subcommittee on Econ. and Consumer Policy Rpt. (Feb. 4, 2021) https://oversightdemocrats.house.gov/imo/media/doc/2021-02-04%20ECP%20Baby%20Food%20Staff%20Report.pdf; Staff Report, H.R. Subcommittee on Econ. and Consumer Policy Rpt. (Sept. 29, 2021) ECP Second Baby Food Report 9.29.21 FINAL.pdf.

[12] *Id.*

[13] *Id.* at 2-3.

own limits and sold foods that consistently tested above their limits. Congress found the following:

27. **Beech-Nut.** Beech-Nut used ingredients after they tested as high as 913.4 ppb[14] arsenic. Beech-Nut routinely used high-arsenic additives that tested over 300 ppb arsenic to address product characteristics such as "crumb softness."[15] On June 8, 2021, four months following the Congressional findings, Beech-Nut issued a voluntary recall of its infant single grain rice cereal and exited the rice cereal market completely.[16] In its recall, Beech-Nut confirmed that its products exceed regulatory arsenic limits.[17] And, Beech-Nut used ingredients containing as much as 886.9 ppb lead, as well as 483 products that contained over 5 ppb lead, 89 that contained over 15 ppb lead, and 57 that contained over 20 ppb lead. In its follow up Report in September 2021, Congress specifically focused on Defendants Beech-Nut and Gerber's infant rice cereals. Congress noted that Beech-Nut rice cereal tested up to 125 ppb inorganic arsenic and averaged 85.47 ppb inorganic

---

[14] Ppb (or ppbm) is used to measure the concentration of a contaminant in soils, sediments, and water. 1 ppb equals 1 µg (microgram) of substance per kg of solid (µg/kg). For the average baby weighing approximately 3kg, the quantities of Toxic Heavy Metals found in Defendants' Contaminated Baby Foods, as explained below, pose significant health risks.
[15] *Id.* at 3.
[16] FDA, *Beech-Nut Nutrition Company Issues a Voluntary Recall of One Lot of Beech-Nut Single Grain Rice Cereal and Also Decides to Exit the Rice Cereal Segment* (June 8, 2021) https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/beech-nut-nutrition-company-issues-voluntary-recall-one-lot-beech-nut-single-grain-rice-cereal-and.
[17] Sandee LaMotte, *Beech-Nut to stop selling baby rice cereal after finding high arsenic levels*, CNN, (June 9, 2021, updated 12:23PM EDT), https://www.cnn.com/2021/06/09/health/beech-nut-baby-food-recall-wellness.

arsenic.[18] Beech-Nut's practice of testing ingredients, rather than finished products, for Toxic Heavy Metals appears to have contributed to its failure to detect the dangerous inorganic arsenic levels in its recalled products.[19]

28.    **Gerber.**  Gerber used high-arsenic ingredients, using 67 batches of rice flour that had tested over 90 ppb inorganic arsenic.[20]  Gerber used ingredients that tested as high as 48 ppb lead; and used many ingredients containing over 20 ppb lead.[21]  In the September 2021 follow-up Congressional report, it was revealed that Gerber's rice cereal tested up to 116 ppb inorganic arsenic, and their average rice cereal product contained 87.43 ppb inorganic arsenic, which is even higher than the amount contained in Beech-Nut's average rice cereal product.[22] While Beech-Nut recalled some of its products and completely discontinued sales of its cereal, Gerber have taken no such actions to protect children.

29.    **Hain (Earth's Best Organic).**  Hain sold finished baby food products containing as much as 129 ppb inorganic arsenic.[23]  Hain typically only tested its ingredients, not finished products.[24] Documents show that Hain used ingredients

---

[18] Staff Report, H.R. Subcommittee on Econ. and Consumer Policy Rpt. (Sept. 29, 2021) https://oversightdemocrats.house.gov/imo/media/doc/ECP%20Second%20Baby%20Food%20Report%209.29.21%20FINAL.pdf.
[19] *Id*. at 3.
[20] *Id*. at 3.
[21] *Id*.
[22] Staff Report, H.R. Subcommittee on Econ. and Consumer Policy Rpt. (Sept. 29, 2021) at 3.
[23] Staff Report, H.R. Subcommittee on Econ. and Consumer Policy Rpt. (Feb. 4, 2021) at 3.
[24] *Id*.

testing as high as 309 ppb arsenic.[25] Hain used ingredients containing as much as 352 ppb lead.[26] Hain used many ingredients with high lead content, including 88 that tested over 20 ppb lead and six that tested over 200 ppb lead.[27]

30. **Plum.** Plum, along with Campbell, refused to cooperate with the Congressional investigation. Instead of producing any substantive information, Campbell provided Congress with a self-serving spreadsheet declaring that every one of its products sold through Plum "meets criteria," while declining to state what those criteria were.[28] Congress noted that "[t]his misleading framing—of meeting criteria that do not exist—raises questions about what [Plum's] other thresholds actually are, and whether they exist."[29] This suspicion is confirmed by HBBF's independent testing which confirms the presence of Toxic Heavy Metals in Plum Baby Food, which found excess levels of heavy metals, including, but not limited to, lead and arsenic in Plum's Just Sweet Potato Organic Baby Foods; Just Peaches Organic Baby Food; Just Prune Organic Baby Food; Pumpkin Banana Papaya Cardamom; Apple, Raisin & Quiona Organic Baby Food; Little Teethers Organic Multigrain Teething Wafers-Banana with Pumpkin; and Mighty Morning Bar-

---

[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] *Id.* at 44.
[29] *Id.* at 45.

15

Blueberry Lemon-Tots.[30]

31.  **Walmart**.  Walmart  refused  to  cooperate  with  the  House Subcommittee's investigation into its baby foods products, and as such, the Subcommittee was "greatly concerned" that Walmart "might be obscuring the presence of higher levels of toxic metals in their baby food products."[31] The Subcommittee noted that independent data from the HBBF Report confirmed that Walmart's baby foods are indeed tainted.[32] For example, the HBBF Report observed that one of Walmart's products contained 56.1 ppb total arsenic.[33] Another product contained 108 ppb total arsenic, 66 ppb inorganic arsenic, and 26.9 ppb lead.[34]

32.  Following the publication of the Subcommittee Report, Walmart provided documents to the Subcommittee. On September 29, 2021, the House Subcommittee released a subsequent report entitled "New Disclosures Show Dangerous Levels of Toxic Heavy Metals in Even More Baby Foods."[35] The Subcommittee report addendum described the documents from Walmart as "revealing a concerning lack of attention to toxic heavy metal levels in baby food

---

[30] *See generally*, Jane Houlihan, https://hbbf.org/sites/default/files/2022-12/BabyFoodReport_ENGLISH_R6_0.pdf.
[31] H.R. Subcommittee on Econ. and Consumer Policy Rpt. (Feb. 4, 2021) at 2.
[32] *Id*. at 5.
[33] Jane Houlihan, https://hbbf.org/sites/default/files/2022-12/BabyFoodReport_ENGLISH_R6_0.pdf at 27.
[34] *Id*. at 26.
[35] H.R. Subcommittee on Econ. and Consumer Policy Rpt. (Sept. 29, 2021).

and an abandonment of its previously more protective standards."[36] Walmart does not appear to conduct any testing of its baby food products.[37] Walmart sets maximum arsenic and lead levels and asks the manufacturer of its private label to self-certify, but Walmart does not appear to collect any test data or check the accuracy of those certifications.[38]

33.    The metal concentrations discussed above and further below surpass the limits allowed by U.S. regulatory agencies. There are no FDA final regulations governing the presence of Toxic Heavy Metals in the majority of Baby Foods with the exception of 100 ppb inorganic arsenic in infant rice cereal and some recently finalized limits for lead in certain baby food categories.[39] To the extent such regulations exist, the quantities of Toxic Heavy Metals in Defendants' Baby Foods exceed any permissible FDA levels.  To be sure, the FDA has set the maximum contaminant levels ("MCL") in bottled water at 10 ppb inorganic arsenic and 5 ppb lead.[40]  However, these limits were created in reference to *adult* exposure, not infants.  Compared to these thresholds, the test results of Defendants' Contaminated Baby Foods and their ingredients are multiple folds greater than the permitted metal levels.  They are also far greater than permitted by the FDA's final guidance for lead, issued January 6, 2025, which sets limits at 10 or 20 ppb for baby foods (10

---

[36] *Id*. at 2.
[37] *Id*. at 21.
[38] *Id*.
[39] *Id*.
[40] *Id*. 2-3.

ppb for fruits, 10 ppb for single or mixed vegetable purees/puddings, 20 ppb for single ingredient root vegetables, and 20 ppb for dry cereals) and 10 or 20 ppb for juices (10 ppb for apple juice or single-strength juice and 20 ppb for juice blends containing apple juice), and the FDA's proposed limit for arsenic in apple juice (10 ppb).[41]  Moreover, compounding these troubling findings, Defendants set internal limits for the presence of Toxic Heavy Metals in their foods that were, themselves, dangerously high and then routinely failed to abide by those inadequate standards, as discussed below.

34.    As Congress observed, Defendants have willfully sold—and continue to sell—Contaminated Baby Foods notwithstanding their full awareness of these unacceptably high levels of Toxic Heavy Metals in their products.

### III. Defendants Engaged in a Pattern and Practice of Selling Contaminated Baby Foods and Failed to Reduce Metal Levels

35.    Several factors drive the Toxic Heavy Metal contamination of Defendants' Contaminated Baby Foods, all of which are within Defendants' control.

36.    *First*, at various times, all Defendants sourced ingredients that contained elevated levels of Toxic Heavy Metals.  These ingredients were then used to manufacture the Contaminated Baby Foods consumed by Plaintiff, thereby

---

[41] FDA, *FDA Issues Final Guidance for Industry on Action Levels for Lead in Processed Food Intended for Babies and Young Children* (January 6, 2025), https://www.fda.gov/food/hfp-constituent-updates/fda-issues-final-guidance-industry-action-levels-lead-processed-food-intended-babies-and-young.

exposing Plaintiff to Toxic Heavy Metals that cause brain damage and other neurodevelopmental harm. One way for Defendants to "deal" with this issue involved relegating any testing of Toxic Heavy Metals to suppliers and co-manufacturers, who were required to certify that Toxic Heavy Metals were below a certain threshold. Defendants would audit those results, discover that the reported certifications were false or inaccurate, and then take no action to stop the use of those ingredients or finished products.

37.    *Second*, some Defendants implemented dangerously high internal limits ("specifications" or "specs") for the maximum level of Toxic Heavy Metals that Defendants allowed in the Contaminated Baby Foods. Such high limits—untethered to any consideration of the low levels at which metals are capable of damaging babies' brains—allowed Defendants to source and use ingredients that contained elevated Toxic Heavy Metals to manufacture the Contaminated Baby Foods consumed by Plaintiff. In the highly competitive and lucrative baby food market, using contaminated ingredients allows each Defendant to retain greater market share.

38.    *Third*, some Defendants failed to implement *any* internal specifications for the amount of Toxic Heavy Metals allowed in ingredients or finished baby foods. By simply not looking at the issue, certain highly contaminated ingredients and finished products were allowed to be used and sold to consumers. This would

happen notwithstanding Defendants' specific knowledge of the risk of Toxic Heavy Metals and their presence in ingredients and finished products.

39.     *Fourth,* Defendants did not routinely adhere to their own internal metal specifications or standards, allowing contaminated ingredients and finished products to be released as "exceptional releases" or other simpler terminology. This resulted in ingredients being used and baby foods manufactured and sold that contained levels of Toxic Heavy Metals far higher than what was internally set by Defendants. In other instances, Defendants would test products that had been put on the market after-the-fact, learn about the products containing extremely high levels of Toxic Heavy Metals, and then take no action to recall the product or warn consumers about the issue.

40.     *Fifth*, upon information and belief, Defendants' manufacturing practices also contributed to contamination. For example, the water used at some of the facilities where the baby foods were manufactured contained Toxic Heavy Metals which, in turn, ended up in the finished baby food product sold for consumption by babies.

## A.     Defendants Prioritized Profits Over Reducing Toxic Heavy Metals in their Contaminated Baby Foods.

### 1. Beech-Nut

41.     Beech-Nut did not test its finished baby foods for heavy metals, only ingredients. And Beech-Nut regularly accepted ingredients testing far higher than

20

its internal limits for Toxic Heavy Metals. It justified such deviations as "exceptional releases." For example, Beech-Nut "exceptionally released" 160,000 pounds of sweet potatoes for its baby food products notwithstanding the ingredient testing twice as high as Beech-Nut's internal heavy metal limit for lead.

42. Moreover, Beech-Nut did not adequately test ingredients for heavy metals by limiting ingredient lots and ingredient quantities that were subject to metal testing. For example, if a supplier supplied ingredients below a certain amount, Beech-Nut would not test anything and simply use the ingredient in the finished product. Furthermore, in deciding to violate its own internal limits, Beech-Nut took advantage of the fact that the FDA does not routinely test baby foods for Toxic Heavy Metals.

43. Upon information and belief, Beech-Nut went so far as to manipulate testing practices by continually re-testing ingredients that tested above internal specs until obtaining a result that was at or below the internal specs, knowing full well that the ingredient was nonetheless contaminated.

44. Beech-Nut's internal specifications varied wildly by ingredient, with Beech-Nut allowing very high levels of Toxic Heavy Metals for certain ingredients, and insisting on lower levels for others. Thus, certain products, such as rice flour, were allowed to have very high levels of metals, like arsenic and lead, even in products that were 90% or more rice. Beech-Nut did this because there were no

21

regulations governing Toxic Heavy Metal in baby food and, therefore, to remain competitive in the baby food marketplace, Beech-Nut used contaminated ingredients because they were readily available.

### 2. Gerber

45.   Gerber tested ingredients and, occasionally, finished products. However, while Gerber was one of the only manufacturers in the Congressional Reports to test both ingredients and finished products with any regularity, they set high heavy metal limits that rendered their food unsafe. For baby foods generally, between 2012 and 2019, Gerber set a limit of 40 ppb for lead and 20 ppb for arsenic. For infant rice cereal, between 2012 and 2017, Gerber set a lead limit of 100 ppb, with a "target" of 50 ppb in 2016 and 2017. Between 2018 and 2019, Gerber set a lead limit for 50 ppb. For arsenic in rice cereal, between 2012 and 2015, Gerber did not have a limit, merely a target of 100 ppb. Then, between 2016 and 2018, it set the arsenic limit at 100 ppb. By 2019, Gerber increased the arsenic limit to 130 ppb for cereals with 90% rice (and kept the limit at 100 ppb for other cereals). For snack foods, Gerber had a lead limit of 150 ppb between 2012 and 2014. It was reduced to 100 ppb in 2016 and 2017, and then went down to 50 ppb in 2018 and 2019. There was no limit for arsenic in snack food prior 2016, just a "target" of 100 ppb. Then a 100-ppb arsenic limit was set starting in 2016. With these exceptionally high limits, Gerber sold baby foods that were dangerous for infant consumption. They did this

22

knowingly.

46.   Gerber would also audit and re-test Toxic Heavy Metal results submitted by suppliers, and find that the certification from suppliers were incorrect or false. Gerber would nonetheless use the certified results and release products despite the ingredients not meeting specifications or being safe for infant consumption.

47.   Gerber often used high-arsenic ingredients, for example, using 67 batches of rice flour that had tested over 90 ppb inorganic arsenic. Furthermore, Gerber regularly sold baby food products testing over 100 ppb arsenic, at times reaching 116 ppb, and their average rice cereal product contained 87.43 ppb inorganic arsenic. Indeed, this is why Congress noted that "Gerber's organic rice cereal is dangerous…" In other instances, Gerber permitted as much as 300 ppb of arsenic in the rice flour ingredient used to manufacture its U.S. baby foods, notwithstanding the fact that Gerber often implemented stricter standards for baby foods sold in other countries.

48.   Gerber's baby foods are also contaminated with elevated levels of lead. Gerber used ingredients that tested as high as 48 ppb lead and used many ingredients containing over 20 ppb lead. Furthermore, Gerber sold baby food products testing at and/or above 50 ppb of lead. Indeed, Gerber would have historically permitted as much as 150 ppb lead in their baby food products.

Although Gerber was fully aware that it was very feasible to source lower-lead ingredients, they proceeded to use high-lead ingredients in their baby foods.

49.     Moreover, compounding these troubling findings, Gerber historically only tested certain ingredients of its baby food products and only occasionally tested the finished products consumed by babies. It was not until recently that Gerber started to implement finished product testing on a more regular basis.

50.     Gerber has known since at least the 1990s that inorganic arsenic was neurotoxic and caused developmental issues. Despite this knowledge, in 2012, when Gerber's infant rice cereal was on the front page of a Consumer Report article on arsenic, a Gerber spokesperson told the public that arsenic in baby food posed no health risk.

### 3. Hain

51.     Hain did not test its baby food products for heavy metals until 2020 (rice cereal) and 2021 (other baby food). Instead, Hain tested some ingredients used in their foods (but not all ingredients). Ingredients were required to meet specific specifications for each specific ingredient. Those specifications, however, would change wildly without explanation. For example, prior to August 2014, Hain's lead specification for oat flour was 200 ppb. Then it was reduced to 50 ppb for four months, went back up to 100 ppb for three months, went back up to 200 ppb for a month, came down to 20 ppb for seven months, went to 25 ppb for six months, and

then went back to 200 ppb for the next fourteen months. When asked about this seemingly chaotic shifting of specifications, Hain could not explain it.

52.    Hain would routinely accept ingredients that tested above specifications and use them in baby foods anyway. These "exceptional" releases were made because there were no FDA regulations specifically preventing them.

53.    Because Hain only tested ingredients, and not finished products, they would underestimate metal exposure. For example, in August 2019, the FDA did what Hain had refused: it actually tested Hain's baby food products for heavy metals. FDA sampled Hain's rice cereal and found levels in excess of 100 ppb. FDA tested 20 of Hain's rice cereal products (all manufactured by Beech-Nut for Hain) sold between September 2017 and June 2018, and found 9 samples in excess of 100 ppb of inorganic arsenic, and 16 (80%) above 90 ppb. The FDA raised concern about Hain's failure to test finished products, and asked Hain to conduct an investigation. These concerns about Hain's rice cereal were independently confirmed by HBBF, where they found 113 and 107 ppb of inorganic arsenic (138 and 126 ppb of arsenic) in those same products. As a result of the FDA-ordered investigation, Hain learned that its rice cereal exceeded FDA arsenic levels because Hain never accounted for the arsenic added to the product from the vitamin premix. Hain discovered that the vitamin premix specification was 3,000 ppb for arsenic and 4,000 ppb for lead. Hain realized that its products needed to be tested in finished

25

form to actually estimate the levels of heavy metals in their foods. Hain also realized that the use of brown rice was contributing to the high levels of arsenic, so, thereafter, it started using white rice (as opposed to brown rice) to reduce arsenic levels and began testing rice cereal regularly.

54.    Hain's inept process of monitoring the safety of its baby foods resulted in products being sold that contained Toxic Heavy Metals, and this was done with full knowledge of the risks. When asked why Hain did not warn consumers of the Toxic Heavy Metals in its foods, Hain responded that if it warned, people would not buy its products.

### 4. Plum

55.    Plum was founded in 2007 and has sold a wide variety of baby food products under the name Plum Organics since that time. Plum was owned and controlled by Campbell from June 2013 until roughly May 2021 when Plum was sold to Sun-Maid Growers of California.

56.    Despite Plum's public facing statements that "little ones deserve the very best food from the very first bite" and despite understanding that environmental toxins, and specifically Toxic Heavy Metals, can cause neurodevelopmental disorders in children, Plum failed to take reasonable steps to ensure that the Plum baby food products marketed for consumption by children were not contaminated with dangerous levels of heavy metals. For example, though

26

Plum knew that the heavy metal contents of the ingredients used in its products varied by growing region and supplier, it did not undertake an effort to source ingredients with the lowest amount of heavy metals available. And, despite knowing that certain ingredients carry a higher risk for heavy metal contamination, Plum and Campbell did not reformulate their products to ensure that they were being made with the lowest achievable amount of heavy metals.

57. Plum and Campbell failed to set limits on the amount of heavy metals that could be present in Plum's finished baby food products. From 2007 to at least April 2021, they did not set *any* limits for the amount of lead or arsenic, or aluminum that their finished products could contain.

58. Plum and Campbell also failed to set limits on the amount of heavy metals that could be present in the ingredients used in Plum's baby food products. Prior to 2016, they did not set limits for the amount of heavy metals that could be present in the ingredients used in Plum products. When Plum and Campbell did begin to implement heavy metal limits for Plum ingredients (in or around 2017), it did so only for lead and arsenic.

59. When Plum did set some heavy metal limits (for lead and arsenic for ingredients only) it set those limits several times in excess of what was achievable for most ingredients. For example, despite certain fruits and vegetables normally containing less than 5 ppb lead or arsenic, Plum set the heavy metal limits for all

Plum ingredients for lead and arsenic at 100 ppb. And, even still, despite setting these limits dangerously high, Plum and Campbell still utilized ingredients that tested in excess of those limits.

60. Plum and Campbell also conducted very little oversight of their co-manufacturers to ensure that the heavy metal limits for ingredients used in Plum products were adhered to. For example, prior to 2017, Plum and Campbell did not require their ingredient suppliers to submit heavy metal testing data but instead relied on supplier assurances that the ingredients did not contain heavy metals and/or complied with all government regulations regarding heavy metals. When Plum and Campbell did begin to require testing on some of the ingredients used in its products for lead and arsenic, those efforts were scattershot and did not extend to all lots of all ingredients used in Plum baby food products. Where verification testing was conducted on ingredients, it was often done in an unaccredited lab.

61. Not only did Plum and Campbell fail to implement a competent ingredient testing program to ensure that Plum food marketed for babies was not contaminated with Toxic Heavy Metals, Plum and Campbell also did not conduct heavy metal testing on Plum's finished products prior to sale. Plum only first conducted finished product testing in the wake of public reports that exposed Plum baby food products as being contaminated with dangerous levels of heavy metals. Upon information and belief, no rigorous heavy metal testing program on

28

ingredients and finished product was ever implemented and Plum and Campbell continue to sell baby food contaminated with elevated levels of heavy metals without first testing to ensure their safety.

### 5. Walmart

62.    Walmart sold baby food under a "private" brand called "Parent's Choice," which was manufactured by a different supplier but branded, promoted, and sold as a Walmart product. Walmart did not test it for Toxic Heavy Metals whatsoever. Instead, Walmart required certain specifications to be met for the products provided by its suppliers, which included some limits of heavy metals. These specifications were not enforced in any way. Walmart did not require the submission of testing from suppliers, nor did it do any of its own testing.

63.    The only efforts to police Toxic Heavy Metals in their Parent's Choice baby food involved generic specifications for lead and arsenic—there were no other specifications or limits for other heavy metals—which for most baby food products resulted in there being no limits. The following chart reflects Walmart's Toxic Heavy Metal specifications prior to December 2018.

| Type of Food | Lead | Arsenic |
|---|---|---|
| Dry baby food with no juice or nectar | *None* | *None* |
| Dry baby food with juice or nectar | 50 ppb | 23 ppb |
| Wet baby food with no juice or nectar | *None* | *None* |

29

| Wet baby food with juice or nectar | 50 ppb | 23 ppb |
| Yogurt baby food products | *None* | *None* |

64.    In December 2018, Walmart changed its specification to 100 ppb of inorganic arsenic for all dry baby foods, making the products even less safe. Thus, for the vast majority of Walmart's baby food products, there was never a limit for any Toxic Heavy Metals.

## IV.    Defendants Abandon Efforts to Reduce Metal Levels in Baby Foods.

65.    In 2019, as concerns grew over contamination of certain baby foods on the U.S. market, a consortium of companies comprised of Beech-Nut, Plum, Gerber, Hain, Nurture, and Sprout, as well as certain interested third party groups such as the Environmental Defense Fund ("EDF") and HBBF, was formed with the intention "of reducing heavy metals in young children's food."

66.    The consortium was named the Baby Food Council ("BFC"). The BFC involved the sharing of common testing data on the levels of metal contamination of Defendants' baby foods, a grant to Cornell University to further study the issue, and a proposed "voluntary Baby Food Standard to limit the amounts of heavy metals in baby food." The BFC specifically recognized the risk of neurodevelopmental harm caused by Toxic Heavy Metals to the developing brain of infants and that there were no safe levels of exposure.

67.    The Baby Food Standard "would have provided companies with a

common framework for progressively reducing contaminants by regularly testing products and improving management practices, and for being transparent with consumers about the safety of their products."

68.   After several years of negotiations and discussions, including a proposed system for testing, the EDF and HBBF proposed voluntary limits of 1 ppb for lead. The baby food companies, however, rejected the proposal outright. Participation in the BFC was little more than a façade—they had no intention of self-regulating their products as it related to Toxic Heavy Metals.

69.   This led EDF and HBBF to leave the BFC in protest in 2021. They explained their departure publicly, noting that the companies, including Defendants, "all decided to backpedal on this project—even though the standard was designed to protect babies' brain development" and provide adequate notice to consumers regarding the presence of Toxic Heavy Metals on baby food labeling. EDF explained:

> "'EDF cofounded the Council because we believed there was a shared commitment to reduce levels of lead, arsenic and cadmium in baby food products to better protect children's developing brains from these toxins … Unfortunately, the companies chose to cease the Council's development of a voluntary Baby Food Standard that it had begun in late 2020. The Standard would have provided companies with a common framework for progressively reducing contaminants by regularly testing products and improving management practices, and for being transparent with consumers about the safety of their products. Negotiations failed to provide an alternative approach that EDF felt was sufficient to drive down levels of lead, arsenic and

cadmium in baby food.'"[42]

70.    HBBF explained:

"'Healthy Babies Bright Futures is focused on tangibly reducing neurotoxic exposures to babies. The baby food companies' refusal to jointly set limits for heavy metals in baby food has shown that the Council will no longer be the powerful mechanism for this important work that the initial plans had promised. The baby food companies' decision to stop progress on a voluntary standard for heavy metals in baby food is a disappointment … What started as dedication has turned into delay and intention has become inaction. So HBBF has decided to put our effort into other initiatives that will move the needle on this important issue.'"[43]

71.    In short, Defendants opted to continue "self-regulating," the same self-regulation which exposed—and continued to expose—Plaintiff to Toxic Heavy Metals in Defendants' Contaminated Baby Foods.

## V.    The Dangers of Toxic Heavy Metal Exposure Through Consumption of Baby Foods.

72.    According to the World Health Organization ("WHO"), heavy metals, specifically lead and arsenic, pose a "major public health concern" for children.[44] The Occupational Safety and Health Administration ("OSHA") has warned that these metals "may build up in biological systems and become a significant health

---

[42] EDF, *EDF and Healthy Babies Bright Futures Withdraw from Baby Food Council After Companies Block Work on Voluntary Standard*, (November 5, 2021), https://www.edf.org/media/edf-and-healthy-babies-bright-futures-withdraw-baby-food-council-after-companies-block-work. (last visited February 10, 2026).
[43] *Id*.
[44] World Health Organization, *Children's Health and the Environment WHO training Package for the Health* Sector (Oct. 2011), available at: https://www.who.int/publications/i/item/WHO-CED-PHE-EPE-19-12-01.

hazard."[45]  Indeed, the Department of Health and Human Services' Agency for Toxic Substances and Disease Registry ("ATSDR") ranks arsenic as number *one* among substances present in the environment that pose the most significant potential threat to human health, followed by lead (second).

73.    The threat presented by Toxic Heavy Metals to children's health is widely shared by the global regulatory and scientific community.  For example, the FDA has set an Interim Reference Level ("IRL") of 2.2 micrograms/day for lead exposure through baby food products.[46]  That is the amount of lead exposure at or above which the agency considers associated with adverse neurodevelopmental effects in babies.  The FDA, in its guidance documents for inorganic arsenic and lead in baby food products, has repeatedly acknowledged the dangers of heavy metals to the neurodevelopment of infants.

> "Even low lead exposure can harm children's health and development, specifically the brain and nervous system. Neurological effects of lead exposure during early childhood include learning disabilities, behavior difficulties, and lowered IQ. Lead exposures also may be associated with immunological, cardiovascular, renal, and reproductive and/or developmental effects…Because lead can accumulate in the body, even low-level chronic exposure can be hazardous over time…Even though no safe level of lead exposure has yet been identified for children's health, the IRL serves as a useful benchmark in evaluating the potential for adverse effects of dietary lead. In particular, FDA is focused on the potential for neurodevelopmental effects from lead exposure, as review of the scientific literature indicates that *such*

---

[45] OSHA, *Toxic Metals*, available at: https://www.osha.gov/toxic-metals.
[46] FDA, *Action Levels for Lead in Food Intended for Babies and Young Children: Draft Guidance For Industry*, (January 2025), https://www.fda.gov/media/164684/download.

*adverse effects of lead consistently occur at a blood lead level associated with FDA's IRL for children.* (emphasis added)."[47]

74.    As one recent study observed, "[t]he implications of heavy metals with regards to children's health have been noted to be more severe compared to adults. The elements' harmful consequences on children' health include mental retardation, neurocognitive disorders, behavioral disorders, respiratory problems, cancer and cardiovascular diseases.  Much attention should be given to heavy metals because of their high toxicity potential, widespread use, and prevalence."  Children and, even more so, babies have higher exposure to metals compared to adults because they consume more food in relation to their body weight and absorb metals more readily than adults by 40 to 90%.

75.    The mechanisms needed to metabolize and eliminate heavy metals are comparatively undeveloped in childhood, with babies having weaker detoxifying mechanisms and poorer immune systems than adults.  For example, liver pathways that in adulthood metabolize absorbed arsenic do not mature until mid-childhood; un-excreted arsenic thus continues to circulate and is deposited in other organs. According to Linda McCauley, Dean of the Nell Hodgson Woodruff School of Nursing at Emory University, who studies environmental health effects, "[n]o level of exposure to these [heavy] metals has been shown to be safe in vulnerable infants."

---

[47] *Id.*

34

76.     Thus, "the major windows of developmental vulnerability occur during infancy and early childhood due to continuing brain development after birth."  In short, even small amounts of exposure to Toxic Heavy Metals can have devastating health outcomes for babies and children.

A.     **Exposure to Toxic Heavy Metals Has Been Consistently Associated with Neurodevelopmental Harm, i.e., Autism and ADHD in Pediatric Populations**

77.     It is well-known that exposure to Toxic Heavy Metals in early life can interfere with neurodevelopment at exceedingly low levels of exposure.  And, one of the ways in which such interference with neurodevelopment can present in a child is in the form of the neurodevelopmental disorders ASD and ADHD.  As the U.S. Centers for Disease Control observed in its 2020 Toxicological Profile for Lead, at just ≤10 μg/dL: "The following neurobehavioral effects in children have been associated with [lead]: "Altered mood and behaviors that may contribute to learning deficits, including *attention deficits, hyperactivity, autistic behaviors*, conduct disorders, and delinquency." (emphasis added).  Likewise, the NIH states: "prenatal and early childhood exposure to heavy metals … may be linked to autism spectrum disorder."[48]

78.     Such conclusions have likewise been reached by a consortium of the country's leading epidemiologists, pediatricians, and medical groups, noting that

---

[48] ATSDR, *Toxicological Profile for Lead,* (August 2020) https://www.atsdr.cdc.gov/toxprofiles/tp13.pdf.

35

Toxic Heavy Metals, including, but not limited to, lead, are "prime examples of toxic chemicals that can contribute to learning, behavioral, or intellectual impairment, as well as specific neurodevelopmental disorders such as ADHD or autism spectrum disorder."

79.    Multiple studies, reviews, and meta-analyses conducted throughout various parts of the world over the last decade have consistently observed that early life exposure to heavy metals can cause brain injury and, specifically, brain injury which manifests as ASD.

80.    For example, four meta-analyses published in 2014, 2017, 2019, and 2020, respectively, observed consistent associations between exposure to arsenic, and ASD in children; with the authors in three studies recommending—based on the data—that exposure to such metals in children be reduced as much as possible.[49]

81.    In a recent 2017 NIH-funded prospective observational study, the authors examined the risk of ASD outcome in twins based on their respective body burden of lead.  The study concluded in no uncertain terms that "prenatal and early childhood disruption (excess or deficiency) of multiple metals during critical

---

[49] Jafari, et al., *The association between mercury levels and autism spectrum disorders: A systematic review and meta-analysis* 44 J. TRACE. ELEMEN. IN MED. & BIOL. 289-297 (2017); Wang, et al., *Exposure to Inorganic Arsenic and Lead and Autism Spectrum Disorder in Children: A Systematic Review and Meta-Analysis*, 21 CHEM RES. TOXICOL. 32, 1904-1919 (2019), https://pubmed.ncbi.nlm.nih.gov/31549506/; Sulaiman, et al., *Exposure to Aluminum, Cadmium, and Mercury and Autism Spectrum Disorder in Children: A Systematic Review and Meta-Analysis*, 33 Chem. Res. Toxicol. 11, 2699-2718 (2020), https://pubmed.ncbi.nlm.gov/32990432/; Yoshimasu, et al., *A meta-analysis of the evidence on the impact of prenatal and early infancy exposures to mercury on autism and attention deficit/hyperactivity disorder in the childhood*, NEURO TOXICOL. 121-131 (2014), https://pubmed.ncbo.nlm.nih.gov/24952233/.

developmental windows is associated with ASD and suggests a role for elemental dysregulation in the etiology of ASD."[50]

82.    Similarly, a large, prospective study from 2016 in Korean school children observed that low levels of lead exposure in early life are associated with autism, the authors specifically concluding: "even low blood lead concentrations … are associated with more autistic behaviors … underscoring the need for continued efforts to reduce lead exposure."[51]

83.    Studies have repeatedly observed strong associations between exposure to aluminum other heavy metals and neurodevelopmental disorders such as ASD, as observed by a recent study: "Environmental exposure to…aluminum (Al) has been associated with neurodevelopmental disorders including autism spectrum disorder (ASD)."

84.    Repeated associations between early life Toxic Heavy Metal exposure and ASD have also been observed during the pre-natal timeframe, lending further strength to the findings of post-natal studies. For example, in a 2021 study by Skogheim and colleagues, the authors prospectively assessed the relationship between pre-natal metal exposure in various biomarkers and autism risk. The study concluded that "[r]esults from the present study show several associations between

---

[50] Arora, et al., *Fetal and postnatal metal dysregulation in autism* NATURE COMM. 1-10 (2017), https://www.nature.com/articles/ncomms15493.
[51] Kim, et al., *Low-Level lead Exposure and Autistic Behaviors in School-Age Children,* NEUROTOXICOLOGY 193-200 (2016).

levels of metals and elements during gestation and ASD and ADHD in children. The most notable ones involved arsenic and lead. Our results suggest that even population levels of these compounds may have negative impacts on neurodevelopment."[52]

85.    Similarly, in a study by the research group assessing the New Hampshire Birth Cohort, the authors evaluated the neurotoxic effects of heavy metals during various stages of pregnancy and concluded: "Our results support the hypothesis that exposure to … As in mid to late pregnancy may be neurodevelopmentally harmful."

86.    Such results have been replicated in studies throughout the world, including China, Korea, the U.S., Europe, and Egypt, implicating arsenic and lead in pediatric diagnoses of autism and autistic behaviors.  Indeed, a 2015 Egyptian study noted "[e]nvironmental exposure to these toxic heavy metals, *at key times in development*, may play a ***causal*** role in autism." (emphasis added).

87.    Exposure to Toxic Heavy Metals, specifically lead, has also been repeatedly associated with the development of ADHD in children, as demonstrated by numerous studies.

88.    No fewer than four large meta-analyses, conducted in four different continents (North America, South America, Europe, and Asia), and some

---

[52] Doherty, et al., *Periconceptional and prenatal exposure to metal mixtures in relation to behavioral development at 3 years of age* 4 ENVIRON. EPIDEMIOL. (2020).

employing a cross-sectional design, have observed a consistent association between various metals and ADHD in children. Indeed, the authors of the meta-analysis from Spain noted that "the evidence from the studies allowed us to establish that there is an association between lead and ADHD and that even *low levels of lead raise the risk*." (emphasis added).

89. The findings from the meta-analyses have been replicated in several Chinese studies from 2006, 2014, and 2018, respectively.[53] Notably, the authors of the 2014 Chinese study observed that "[e]xposure to lead even at low levels correlates with attention-deficit/hyperactivity disorder (ADHD). However, lead-contaminated environments are often *contaminated with other heavy metals that could exacerbate lead-induced ADHD*." (emphasis added).[54] This is particularly relevant—and disturbing—as children who consumed Defendants' Contaminated Baby Foods were repeatedly exposed to a cocktail of heavy metals that, synergistically, further increased their risk of developing ADHD.

90. Moreover, studies have observed a dose-response relationship between exposure to Toxic Heavy Metals and ADHD, as demonstrated by the 2016 Spanish

---

[53] Lee, et al., *Heavy Metals' Effect on Susceptibility to Attention-Deficit/Hyperactivity Disorder: Implication of Lead, Cadmium, and Antimony*, 15 INT. J. ENVIRON. RES. PUBLIC HEALTH. 6, 1-2 (2018), https://ncbi.nlm.nih.gov/pmc/artciles/PMC6025252/; Liu, et al., *S100β in heavy metal-related child attention-deficit hyperactivity disorder in an informal e-waste recycling area*, 45 NEURO TOXICOL. 185-191 (2014), https://www.sciencedirect.com/science/article/abs/pii/S0161813X14001831; Wong, V.C.N, *Attention-Deficit Hyperactivity Disorder and Blood Mercury Level: a Case-Control Study in Chinese Children,* 37 NEUROPEDIATRICS 4, 234-40 (2006).
[54] *Liu,* et al. *supra.*

study Donzelli, *et al*. Another 2016 cross-sectional study from Spain was conducted on 261 children aged 6-9 to examine the association between exposure to arsenic and ADHD. After adjusting for potential confounders, the authors observed a dose-response relationship between urine arsenic levels and inattention and impulsivity scores, concluding that "[urine arsenic] levels were associated with impaired attention/cognitive function, *even at levels considered safe*.[55] These results provide additional evidence that postnatal arsenic exposure impairs neurological function in children." (emphasis added).[56]

91. The fact that such results, and many more, have been observed in multiple studies, conducted by different researchers, at different times, in different parts of the world, in children of multiple ages, utilizing different study methods (prospective, case-control, and cross-sectional epidemiological analyses) and measuring a variety of end-points (including hair, blood, and urine), strongly supports a causal relationship between exposure to Toxic Heavy Metals and the development of ASD and ADHD in children.

**B.      Defendants' Contaminated Baby Foods Contain Toxic Heavy Metals Capable of Interfering with Early Neurodevelopment.**

92. As illustrated above, Toxic Heavy Metal exposure is capable of inflicting damage to the developing brain at extremely low doses. And, upon

---

[55] Rodriguez-Barranco, et al., *Postnatal arsenic exposure and attention impairment in school children*, 74 CORTEX 370-382 (2016).
[56] *Id*.

information and belief, Defendants manufactured and sold Contaminated Baby Foods containing Toxic Heavy Metals that can, under certain circumstances (based upon the genetic susceptibilities, medical history, and other factors of the exposed child) interfere with a baby's neurodevelopment sufficient to cause conditions such as ASD and ADHD.

93.   As an initial matter, the study commissioned by HBBF and discussed above specifically evaluated the propensity for arsenic exposure through consumption of infant rice cereal to impact early life neurodevelopment. Following analyses of the levels of arsenic exposure from consumption of infant rice cereal, the authors concluded "that high consumers of infant rice cereal (i.e., infants eating three servings per day) eating products currently on the U.S. market would have a daily arsenic intake of 0.35-0.67 µg/kg bw/day…per the Tsuji et al. (2015) lower-bound estimate for an RfD for the neurodevelopmental effects of arsenic (0.4 µg/kg bw/day), high consumers of infant rice cereal may also be at risk for this endpoint. Even in average consumers of infant rice cereal (i.e., one serving per day), our estimates of arsenic intakes (0.15 to 0.29 µg/kg bw/day) leave little room for exposures to arsenic from other sources." Thus, consumption of Defendants' Contaminated Baby Foods, including, but not limited to, infant rice cereal and rice-based snack baby food products manufactured and sold by Defendants can expose babies to levels of arsenic above that associated with neurodevelopmental harm in

the scientific literature.

94.    Defendants manufactured and sold Contaminated Baby Foods that, with just a couple of servings, are capable of exposing a baby to lead levels at or above the 2.2 ug/day considered by the FDA to be associated with neurodevelopmental harm. Each source of lead exposure is cumulative—making any detectable amount of Toxic Heavy Metal in baby food a contributing factor to potential neurodevelopmental harm.

95.    Similarly, upon information and belief, Defendants were aware of the neurotoxic propensities of lead and arsenic at low levels, but proceeded to manufacture and sell Contaminated Baby Foods containing arsenic and lead levels that, upon information and belief, Defendants knew were capable of inflicting neurodevelopmental harm.

## VI.    Defendants Knowingly Sold Baby Foods Containing Toxic Heavy Metals and Knew or Should Have Known of the Risks of Such Exposures in Children and Thus Breached their Duty of Care in Selling Contaminated Baby Foods.

96.    During the time that Defendants manufactured and sold Contaminated Baby Foods in the United States, the weight of evidence showed that Defendants' Contaminated Baby Foods exposed babies and children to Toxic Heavy Metals. Defendants failed to disclose this risk to consumers through any means.

97.    As discussed above, both independent testing, Defendants' internal evaluations of their Contaminated Baby Foods, and Defendants' representations

42

and disclosures to Congress and the FDA reveal the presence of Toxic Heavy Metals in Defendants' products.  As such, Defendants knew or should have known that their baby foods contain Toxic Heavy Metals with an attendant risk of causing neurodevelopmental harm.

98.   Indeed, independent testing performed in early 2019 demonstrated elevated amounts of such Toxic Heavy Metals in baby food products on the U.S. market,[57] and the HBBF Report further confirmed such contamination of Defendants' Contaminated Baby Foods.[58]  And, as the Congressional investigation found, Defendants continued to sell their Contaminated Baby Foods even after testing of both ingredients and finished products revealed the presence of Toxic Heavy Metals.

99.   Moreover, the scientific literature on the dangers of Toxic Heavy Metals—particularly as it relates to adverse effects on the neurodevelopment of children—have been well known for decades. Defendants, as manufacturers and sellers of Contaminated Baby Foods, are held to the standard of experts and responsible for keeping abreast of the latest scientific developments related are held to the dangers of contaminants in their products.  Defendants failed to take action to protect vulnerable children from exposure to the Toxic Heavy Metals in their foods

---

[57] *See* Gardener, et al., *supra*.
[58] *See* HBBF Report, *supra*.

and, thus, subjected them to the risk of brain injury which can manifest as neurodevelopmental disorders such as ASD, ADHD, and related sequalae.

100. To be clear, Defendants are able to manufacture baby foods that do not pose such a dangerous risk to the health of infants and children by using alternative ingredients, not adding certain pre-mix minerals and vitamins high in Toxic Heavy Metals, and/or sampling their ingredients from other sources. At the very least, Defendants were under a duty to warn unsuspecting parents of the presence of Toxic Heavy Metals in their Contaminated Baby Foods.

**VII. Defendants' Baby Food Products Were Defective Due to Insufficient Warnings, Manufacturing Defects, and/or Design Defects to the Extent the Baby Food Products Contained Detectable Levels of Toxic Heavy Metal.**

101. Defendants' Contaminated Baby Foods that contained detectable levels of Toxic Heavy Metals (or constituted finished products wherein the ingredients contained detectable levels of Toxic Heavy Metals), assuming state of the art analytical testing, were defective as it relates to warnings because Defendants have never warned about the presence of Toxic Heavy Metals in their Contaminated Baby Foods. Because discovery is ongoing, a complete list of Defendants' specific baby foods that contained detectable levels of Toxic Heavy Metals is not known at this time. Based on publicly available testing data, including data reported by HBBF and Congress, the vast majority of Defendants' products contain detectable levels of Toxic Heavy Metals in them, rendering them each

44

defective as it relates to warnings.  Attached as Appendix A to this Complaint is a list of Defendants' products now known to be defective.  This list, however, is not comprehensive and shall be amended as discovery is obtained.

102.  Defendants' Contaminated Baby Foods are also defective as manufactured, as they contain detectable Toxic Heavy Metals which are not supposed to be there, by design.  Toxic Heavy Metals do not provide any nutritional or therapeutic value to infants or fully-grown humans.  They are only poisonous to neurodevelopment.  None of these baby food products, by design, should contain Toxic Heavy Metals in them and, thus, to the extent the products contain detectable levels of Toxic Heavy Metals in them, those are manufacturing defects.  Based on publicly available data, most of Defendants' Contaminated Baby Foods contain some detectable levels of Toxic Heavy Metals in them. However, as the levels of Defendants' baby food products are not known yet, nor does Plaintiff have a complete list of Defendants' baby food products or their formulations—information that will be obtained through discovery—Plaintiff cannot identify each baby food product that contained a manufacturing defect.  However, Appendix A is a running list of baby food products sold by Defendants.

103.  If Defendants specifically designed their baby food products to contain Toxic Heavy Metals, meaning their presence was not the product of a manufacturing defect, then the products were defective by design.  Toxic Heavy

45

Metals should not be present in foods that are being consumed by infants and products should be designed to not have detectable levels of Toxic Heavy Metal in them. Such designs are easily accomplished by only using ingredients that contain non-detectable levels of Toxic Heavy Metals and by testing finished products, before release, to ensure they do not contain Toxic Heavy Metals within them. This is possible because there are examples of Defendants' finished products not containing detectable levels of Toxic Heavy Metals—even if, for those same products, there are instances where they did. Thus, Defendants were able to design baby food products to not contain detectable levels of Toxic Heavy Metals, and to the extent that Defendants' design contemplated there being detectable levels of Toxic Heavy Metals in baby food, the design, itself, was defective. Because Plaintiff does not know Defendants' intended design for their Contaminated Baby Foods—as there has been no discovery obtained to date concerning product formulation, product/ingredient specifications, and testing methodologies/capabilities—Plaintiff cannot specify which baby food products were defectively designed versus which ones were not. That said, Appendix A contains a running list of Defendants' baby food products that, with further discovery, may yield information that will allow Plaintiff to identify whether the product was defectively designed.

104. Whether Defendants' products were defective due to inadequate

46

warnings, manufacturing errors, or by design, the existing publicly available evidence indicates that consumption of Defendants' Contaminated Baby Foods can expose infants to Toxic Heavy Metals, and that depending on specific milieu of products consumed by Plaintiff and Plaintiff's specific susceptibility and circumstances, Defendants' Contaminated Baby Foods contributed to Plaintiff's Toxic Heavy Metal burden during critical period of infant neurodevelopment. Plaintiff, thus, alleges that this cumulative exposure from Defendants' products to Toxic Heavy Metals, substantially contributed to causing neurodevelopmental harm that manifested as ASD and/or ADHD. Moreover, had these Contaminated Baby Foods not been defective—by having sufficient warnings, being correctly manufactured, and/or designed properly—Plaintiff would not have been exposed to levels of Toxic Heavy Metals in Defendants' Contaminated Baby Foods that would have contributed to the neurodevelopmental harm that manifested as ASD and/or ADHD.

## VIII.  Exemplary/Punitive Damages Allegations.

105.  Defendants' conduct, as alleged herein, was done with reckless disregard for human life, oppression, and malice. Defendants' conduct is particularly reprehensible given that their Contaminated Baby Foods were directed at vulnerable babies—a population group far more susceptible than adults to the neurotoxic dangers of heavy metals.

47

106. Defendants were fully aware of the safety risks of Contaminated Baby Foods, particularly the dangerous potential of Toxic Heavy Metals on neurodevelopment in infants and children. Nonetheless, Defendants deliberately crafted their label, marketing, and promotion to mislead consumers. Indeed, Defendants repeatedly market their Contaminated Baby Foods as safe for consumption as well as other statements and representations that hold out their baby foods as safe for consumption by infants. Indeed, Defendants falsely reassured parents/guardians/caregivers that their Contaminated Baby Foods would foster healthy neurodevelopment when consumed even though they knew their baby foods exposed infants' developing brains to potent neurotoxic heavy metals. In fact, as discussed above, Defendants routinely sold Contaminated Baby Foods, regularly flouted their own internal limits of Toxic Heavy Metals, and failed to disclose to consumers that their products contained such dangerous contaminant.

107. This was not done by accident or through some justifiable negligence. Rather, Defendants knew they could profit by convincing consumers that their Contaminated Baby Foods were heathy and safe for infants, and that full disclosure of presence and/or risks of the Toxic Heavy Metals present in the baby foods would limit the amount of money Defendants would make selling the products. Defendants' object was accomplished not only through a misleading label, but through a comprehensive scheme of selective misleading research and testing,

48

failure to test, false advertising, and deceptive omissions as more fully alleged throughout this Complaint. Parents/guardians/caregivers were denied the right to make an informed decision about whether to purchase Defendants' Contaminated Baby Foods for their babies without knowing the full risks attendant to that use. Such conduct was done with conscious disregard of Plaintiff's welfare and rights.

## IX.   Plaintiff-Specific Allegations

108.   Plaintiff was diagnosed with ASD at approximately 4 years of age.

109.   Plaintiff started consuming Contaminated Baby Foods manufactured and/or sold by Defendants in approximately 2019 and consumed Defendants' Contaminated Baby Foods products at various times through early childhood.

110.   Plaintiff consumed substantial quantities of the Contaminated Baby Foods manufactured and sold by Defendants.

111.   Plaintiff has not finished their investigation of the case. Accordingly, the Contaminated Baby Foods identified below may not be exhaustive of the products manufactured and sold by Defendants and consumed by Plaintiff.

112.   **Beech-Nut**: Plaintiff consumed an assortment of Defendant's products, including, but not limited to, food jars, teethers, crackers, and cereal.

113. Upon information and belief, the Contaminated Baby Foods manufactured/marketed by Beech-Nut and consumed by Plaintiff were all

49

contaminated with substantial quantities of Toxic Heavy Metals, namely lead and arsenic—exceeding that of any regulatory limits.

114. Upon information and belief, as a direct and proximate result of consuming Beech-Nut's Contaminated Baby Foods, Plaintiff was exposed to substantial quantities of Toxic Heavy Metals, namely lead and arsenic.

115. As a direct and proximate result of consuming Beech-Nut's Contaminated Baby Foods and the exposure to the Toxic Heavy Metals therein—Plaintiff suffered brain injury which manifested as ASD and related *sequalae*.

116. **Gerber**: Plaintiff consumed an assortment of Defendant's products, including, but not limited to, food jars, teethers, crackers, and cereal.

117. Upon information and belief, the Contaminated Baby Foods manufactured/marketed by Gerber and consumed by Plaintiff were all contaminated with substantial quantities of Toxic Heavy Metals, namely lead and arsenic—exceeding that of any regulatory limits.

118. Upon information and belief, as a direct and proximate result of consuming Gerber's Contaminated Baby Foods, Plaintiff was exposed to substantial quantities of Toxic Heavy Metals, namely lead and arsenic.

119. As a direct and proximate result of consuming Gerber's Contaminated Baby Foods and the exposure to the Toxic Heavy Metals therein—Plaintiff suffered brain injury which manifested as ASD and related *sequalae*.

120. **Hain**: Plaintiff consumed an assortment of Defendant's products, including, but not limited to, food jars, teethers, crackers, and cereal.

121. Upon information and belief, the Contaminated Baby Foods manufactured/marketed by Hain and consumed by Plaintiff were all contaminated with substantial quantities of Toxic Heavy Metals, namely lead and arsenic—exceeding that of any regulatory limits.

122. Upon information and belief, as a direct and proximate result of consuming Hain's Contaminated Baby Foods, Plaintiff was exposed to substantial quantities of Toxic Heavy Metals, namely lead and arsenic.

123. As a direct and proximate result of consuming Hain's Contaminated Baby Foods and the exposure to the Toxic Heavy Metals therein—Plaintiff suffered brain injury which manifested as ASD and related *sequalae*.

124. **Plum**: Plaintiff consumed an assortment of Defendant's products, including, but not limited to, food jars, teethers, crackers, and cereal.

125. Upon information and belief, the Contaminated Baby Foods manufactured/marketed by Plum and consumed by Plaintiff were all contaminated with substantial quantities of Toxic Heavy Metals, namely lead and arsenic—exceeding that of any regulatory limits.

126. Upon information and belief, as a direct and proximate result of consuming Plum's Contaminated Baby Foods, Plaintiff was exposed to substantial quantities of Toxic Heavy Metals, namely lead and arsenic.

127. As a direct and proximate result of consuming Plum's Contaminated Baby Foods and the exposure to the Toxic Heavy Metals therein—Plaintiff suffered brain injury which manifested as ASD and related *sequalae*.

128. **Walmart**: Plaintiff consumed an assortment of Defendant's products, including, but not limited to, food jars, teethers, crackers, and cereal.

129. Upon information and belief, the Contaminated Baby Foods manufactured/marketed by Walmart and consumed by Plaintiff were all contaminated with substantial quantities of Toxic Heavy Metals, namely lead and arsenic—exceeding that of any regulatory limits.

130. Upon information and belief, as a direct and proximate result of consuming Walmart's Contaminated Baby Foods, Plaintiff was exposed to substantial quantities of Toxic Heavy Metals, namely lead and arsenic.

131. As a direct and proximate result of consuming Walmart's Contaminated Baby Foods and the exposure to the Toxic Heavy Metals therein—Plaintiff suffered brain injury which manifested as ASD and related *sequalae*.

**CAUSES OF ACTION**

**COUNT I: STRICT PRODUCTS LIABILITY
FAILURE TO WARN**

132. Plaintiff adopts and incorporates by reference all allegations contained in paragraphs 1 through 131 above.

133. At all relevant times, Defendants engaged in the business of researching, testing, developing, designing, manufacturing, labeling, marketing, selling, inspecting, distributing, and promoting baby foods, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of baby foods in the form of the presence of Toxic Heavy Metals. These actions were under the ultimate control and supervision of Defendants. At all relevant times, Defendants registered, researched, manufactured, distributed, marketed, and sold baby foods and aimed them at a consumer market.

134. Defendants researched, tested, developed, designed, manufactured, labeled, marketed, sold, inspected, distributed, and promoted, and otherwise released into the stream of commerce their Contaminated Baby Foods, and in the course of doing so, directly advertised or marketed the products to consumers and end users, including Plaintiff, and therefore had a duty to warn about the presence of and risks associated with exposure to Toxic Heavy Metals from the consumption of Contaminated Baby Foods.

53

135.   At all relevant times, Defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, and distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure their Contaminated Baby Foods did not cause users and consumers to suffer from unreasonable and dangerous risks.  Defendants had a continuing duty to warn Plaintiff of dangers associated with exposure to Toxic Heavy Metals from consumption of their Contaminated Baby Foods.  Defendants, as a manufacturer, seller, or distributor of food, are held to the knowledge of an expert in the field.

136.   At the time of manufacture, Defendants could have provided warnings or instructions regarding the full and complete risks of exposure to Toxic Heavy Metals in the Contaminated Baby Foods because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such toxins.

137.   At all relevant times, Defendants failed and deliberately refused to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of their product and to those who would foreseeably use or be harmed by exposure to the Toxic Heavy Metals in Defendants' Contaminated Baby Foods.

138.   Even though Defendants knew or should have known that the presence of Toxic Heavy Metals in Contaminated Baby Foods posed a risk of harm, they

54

failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure to the toxins in the products. The neurotoxic characteristic of Toxic Heavy Metals contained in Defendants' Contaminated Baby Foods, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time they distributed, supplied, or sold the products, and were not known to end users and consumers, such as Plaintiff. The product warnings for Contaminated Baby Foods in effect during the time period Plaintiff consumed those foods were inadequate, both substantively and graphically, to alert consumers to the presence of and health risks associated with exposure to the Toxic Heavy Metals from Contaminated Baby Food consumption.

139.   At all relevant times, Defendants' Contaminated Baby Foods reached the intended consumers, handlers, and users or other persons coming into contact with these products, including Plaintiff, without substantial change in their condition as manufactured, sold, distributed, labeled, and marketed by Defendants.

140.   Plaintiff was exposed to the Toxic Heavy Metals in Defendants' Contaminated Baby Foods without knowledge of the potential for such exposure to Toxic Heavy Metals from consumption of the products and the dangerous characteristics of the toxins.

141. At all relevant times, Plaintiff was exposed to the Toxic Heavy Metals in Defendants' Contaminated Baby Foods while consuming the foods for their intended or reasonably foreseeable purposes, without knowledge of their dangerous characteristics.

142. Plaintiff could not have reasonably discovered the defects and risks associated with exposure to the Toxic Heavy Metals in the Contaminated Baby Foods prior to or at the time of Plaintiff consuming those foods. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendants to know about and disclose serious health risks associated with exposure to the toxins in Defendants' products.

143. The information that Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiff to avoid consuming the products and, in turn, exposure to the Toxic Heavy Metals. Instead, Defendants disseminated information that was inaccurate, false, and misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to the Toxic Heavy Metals in the Contaminated Baby Foods; continued to aggressively promote the safety of their products, even after they knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and

56

promotion, any information or research about the risks and dangers of exposure to Toxic Heavy Metals from consumption of Contaminated Baby Foods.

144.    This alleged failure to warn is not limited to the information contained on Contaminated Baby Foods labeling. Defendants were able, in accordance with federal law, to comply with relevant state law by disclosing the known risks associated with exposure to Toxic Heavy Metals in Contaminated Baby Foods through other non-labeling mediums, i.e., promotion, advertisements, public service announcements, and/or public information sources. But Defendants did not disclose these known risks through any medium. The ability to provide such warnings is not prohibited by any federal law.

145.    Furthermore, Defendants possess a First Amendment Right to make truthful statements about the products they sell, and no law could lawfully restrict that constitutional right. This included making statements about the presence of and risks associated with Toxic Heavy Metals in Contaminated Baby Foods.

146.    Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with exposure to the toxins in their Contaminated Baby Foods, Plaintiff could have avoided the risk of developing injuries and could have obtained or used alternative products. However, as a result of Defendants' concealment of the dangers posed by the Toxic Heavy

Metals in their Contaminated Baby Foods, Plaintiff could not have avoided their exposures.

147.    Defendants' conduct, as described above, was reckless. Defendants risked the lives of babies and children, including Plaintiff, with knowledge of the safety problems associated with Contaminated Baby Foods, and suppressed this knowledge from the general public. Defendants made conscious decisions not to warn or inform the unsuspecting public.

148.    Defendants' lack of adequate warnings and instructions accompanying their Contaminated Baby Foods caused Plaintiff's injuries.

149.    As a direct and proximate result of Defendants' failure to provide an adequate warning of the risks of exposure to Toxic Heavy Metals in their Contaminated Baby Foods, Plaintiff has been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss, and damages including, but not limited to, past and future medical expenses, lost income, and other damages.

**WHEREFORE**, Plaintiff respectfully requests this Court enter judgment in Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT II: STRICT PRODUCTS LIABILITY
## MANUFACTURING DEFECT

150. Plaintiff adopts and incorporates by reference all allegations contained in paragraphs 1 through 131 above.

151. At all times herein mentioned, Defendants designed, manufactured, tested, marketed, sold, handled, and distributed the Contaminated Baby Foods consumed by Plaintiff.

152. At all relevant times, the Contaminated Baby Foods consumed by Plaintiff were expected to and did reach Plaintiff without a substantial change in their condition as manufactured, handled, distributed, and sold by Defendants.

153. At all relevant times, the Contaminated Baby Foods consumed by Plaintiff were used in a manner that was foreseeable and intended by Defendants.

154. The Contaminated Baby Foods consumed by Plaintiff were not reasonably safe for their intended use and were defective with respect to their manufacture, as described herein, in that Defendants deviated materially from their design and manufacturing specifications and/or such design and manufacture posed an unreasonable risk of harm to Plaintiff. Baby food should not, by design, contain any detectable levels of Toxic Heavy Metals in them. Thus, Defendants' Contaminated Baby Foods contain manufacturing defects.

155. Defendants' Contaminated Baby Foods contained Toxic Heavy Metals because, while in the control and possession of Defendants, they manufactured

ingredients and used manufacturing processes that resulted in the finished product being contaminated with Toxic Heavy Metals. Had Defendants properly manufactured (directly or through co-manufacturers) the Contaminated Baby Foods, they would not have contained detectable levels of Toxic Heavy Metals in them and, thus, would not have contained a manufacturing defect.

156. Nothing under federal law limited or restricted Defendants from taking action to reduce or eliminate Toxic Heavy Metals from being present in their baby foods.

157. This manufacturing defect caused Plaintiff to be exposed to Toxic Heavy Metals through ingestion of the Contaminated Baby Foods which, in turn, caused neurodevelopmental harm that manifested as ASD and/or ADHD.

158. The exposure to the Toxic Heavy Metals in the Contaminated Baby Foods creates risks to the health and safety of babies that are far more significant than the risks posed by non-Contaminated Baby Food products, and which far outweigh the utility of the Contaminated Baby Foods products because of Defendants' manufacturing defects.

159. Defendants have intentionally and recklessly manufactured the Contaminated Baby Foods with wanton and willful disregard for the rights and health of Plaintiff, and with malice, placing their economic interests above the health and safety of Plaintiff.

160.   As a direct and proximate result of Defendants' defective manufacture of the Contaminated Baby Foods, Plaintiff have been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss, and damages including, but not limited to, medical expenses, lost income, and other damages.

**WHEREFORE**, Plaintiff respectfully requests this Court enter judgment in Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT III: STRICT PRODUCTS LIABILITY
### DESIGN DEFECT

161.   Plaintiff adopts and incorporates by reference all allegations contained in paragraphs 1 through 131 above.

162.   At all times relevant herein, Defendants designed, manufactured, tested, marketed, sold, handled, and distributed the Contaminated Baby Foods consumed by Plaintiff. These actions were under the ultimate control and supervision of Defendants.

163.   At all relevant times, Defendants' Contaminated Baby Foods were designed and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use or consumption by infants and babies, including Plaintiff.

61

164. Defendants' Contaminated Baby Food products as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in that, when they were placed into the stream of commerce, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

165. Defendants' Contaminated Baby Food products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants, were defective in design and formulation in that, when they left the hands of Defendants, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

166. At all relevant times, the Contaminated Baby Food products consumed by Plaintiff were expected to and did reach Plaintiff without a substantial change in their condition as designed, manufactured, handled, distributed, and sold by Defendants

167. At all relevant times, Defendants knew or had reason to know that their Contaminated Baby Food products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendants.

168. Therefore, at all relevant times, Defendants' Contaminated Baby Foods, as researched, tested, developed, designed, registered, licensed,

62

manufactured, packaged, labeled, distributed, sold, and marketed by Defendants, were defective in design and formulation, in one or more of the following ways:

A. When placed in the stream of commerce, Defendants' Contaminated Baby Food products were unreasonably dangerous in that they contained Toxic Heavy Metals that posed a risk of causing interference with neurodevelopment in babies that manifests as the neurodevelopmental disorders ASD, ADHD, and related sequalae when used in a reasonably anticipated manner;

B. When placed in the stream of commerce, Defendants' designed Contaminated Baby Food products to contain unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

C. Defendants, by design, did not sufficiently test, investigate, or study their Contaminated Baby Food products;

D. Exposure to Toxic Heavy Metals in Defendants' Contaminated Baby Food products present a risk of harmful effects that outweigh any potential utility stemming from their use;

E. Defendants, by design, did not conduct adequate post-marketing surveillance of their Contaminated Baby Food products which would have alerted the public to the risks; and

63

F. Defendants could have employed safer alternative designs and formulations for Contaminated Baby Foods, such as ensuring the baby food did not have any detectable level of Toxic Heavy Metals.

169. Plaintiff consumed Defendants' Contaminated Baby Food products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

170. Defendants' Contaminated Baby Food products were and are more dangerous than alternative products, and Defendants could have designed their Contaminated Baby Food products to avoid harm to children. Indeed, at the time Defendants designed the Contaminated Baby Food products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

171. At the time the Contaminated Baby Food products left Defendants' control, there was a practical, technically feasible, and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendants' Contaminated Baby Foods.

172. Defendants intentionally and recklessly defectively designed the Contaminated Baby Foods with wanton and willful disregard for the rights and health of Plaintiff, and with malice, placing their economic interests above the health and safety of Plaintiff.

64

173. The design defects in Defendants' Contaminated Baby Foods were substantial factors in causing Plaintiff's injuries.

174. As a direct and proximate result of Defendants' defective design of the Contaminated Baby Foods, Plaintiff has been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss, and damages including, but not limited to, medical expenses, lost income, and other damages.

**WHEREFORE**, Plaintiff respectfully requests this Court enter judgment in Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT IV: NEGLIGENCE
## FAILURE TO WARN

175. Plaintiff adopts and incorporates by reference all allegations contained in paragraphs 1 through 131 above.

176. At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting baby foods. Defendants knew, or, by the exercise of reasonable care, should have known that their Contaminated Baby Foods are not accompanied with adequate warnings concerning the dangerous characteristics of exposure to Toxic Heavy Metals from consumption. These actions were under the ultimate control and

supervision of Defendants.

177. Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce their Contaminated Baby Foods, and in the course of doing so, directly advertised or marketed the products to consumers and end users, including Plaintiff, and therefore had a duty to warn of the risks associated with the presence of and exposure to Toxic Heavy Metals from consumption of Contaminated Baby Foods.

178. At all relevant times, Defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure their Contaminated Baby Foods did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendants had a continuing duty to warn Plaintiff of dangers associated with the presence of and exposure to Toxic Heavy Metals from consumption of Contaminated Baby Foods. Defendants, as a manufacturer, seller, or distributor of food products, are held to the knowledge of an expert in the field.

179. At the time of manufacture, Defendants could have provided warnings regarding the presence of and risks of exposure to Toxic Heavy Metals from consumption of Contaminated Baby Foods because they knew or should have

known exposure to Toxic Heavy Metals from consumption of Contaminated Baby Foods was dangerous, harmful, and injurious when the Contaminated Baby Foods were consumed by Plaintiff in a reasonably foreseeable manner.

180. At all relevant times, Defendants failed and deliberately refused to investigate, study, test, or promote the safety of or to minimize the dangers to users and consumers of their products and to those who would foreseeably use or be harmed by Defendants' Contaminated Baby Foods.

181. Defendants knew or should have known that exposure to Toxic Heavy Metals from consumption of Contaminated Baby Foods posed a risk of harm, but failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure to the toxins in the products. The dangerous propensities of exposure to Toxic Heavy Metals from consumption of the Contaminated Baby Foods, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time they distributed, supplied, or sold the products, and were not known to end users and consumers, such as Plaintiff.

182. At all relevant times, Plaintiff was exposed to Toxic Heavy Metals through consumption of the Contaminated Baby Foods while using the products for their intended or reasonably foreseeable purposes, without knowledge of their dangerous characteristics.

67

183. Defendants knew or should have known that the non-extant warnings disseminated with their Contaminated Baby Foods were inadequate, failed to communicate adequate information on the presence of and dangers of exposure to toxins contained therein, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses.

184. The information that Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiff to avoid using the product and, in turn, prevented exposure to the Toxic Heavy Metals contained therein. Instead, Defendants disseminated information that was inaccurate, false, and misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Toxic Heavy Metals in the Contaminated Baby Foods; continued to aggressively promote the efficacy of their products, even after they knew or should have known of the unreasonable risks from use or exposure to the toxins contained therein; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Toxic Heavy Metals from consumption of the Contaminated Baby Foods.

185. A reasonable company under the same or similar circumstance would

have warned and instructed of the dangers of exposure to Toxic Heavy Metals from consumption of Contaminated Baby Foods.

186. This failure to warn is not limited to the information contained on the labeling of Defendants' Contaminated Baby Foods. Defendants were able, in accord with federal law, to comply with relevant state law by disclosing the known risks associated with exposure to Toxic Heavy Metals from consumption of Contaminated Baby Foods through other non-labeling mediums, i.e., promotion, advertisements, public service announcements, and/or public information sources. But Defendants did not disclose these known risks through any medium.

187. Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with the presence of and exposure to Toxic Heavy Metals in the Contaminated Baby Foods, Plaintiff could have avoided the risk of developing injuries and could have obtained or used alternative products. However, as a result of Defendants' concealment of the dangers posed by their Contaminated Baby Foods, Plaintiff could not have avoided their injuries.

188. Defendants' conduct, as described above, was reckless. Defendants risked the lives of consumers and users of their products, including Plaintiff, with knowledge of the safety problems associated with Contaminated Baby Foods, and suppressed this knowledge from the general public. Defendants made conscious

decisions not to warn or inform the unsuspecting public.

189. Defendants' lack of adequate warnings and instructions accompanying their Contaminated Baby Foods were a substantial factor in causing Plaintiff's injuries.

190. As a direct and proximate result of Defendants' failure to provide an adequate warning of the risks of exposure to Toxic Heavy Metals from consumption of Contaminated Baby Foods, Plaintiff has been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss, and damages, including, but not limited to, past and future medical expenses, lost income, and other damages.

**WHEREFORE**, Plaintiff respectfully requests this Court enter judgment in Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

### COUNT V: NEGLIGENCE MANUFACTURING

191. Plaintiff adopts and incorporates by reference all allegations contained in paragraphs 1 through 131 above.

192. At all relevant times, Defendants manufactured, tested, marketed, sold, and distributed the Contaminated Baby Foods that Plaintiff consumed.

193. Defendants had a duty to exercise reasonable care in the

70

manufacturing, testing, marketing, sale, and distribution of baby foods.

194. Defendants knew or, by the exercise of reasonable care should have known, that exposure to Toxic Heavy Metals from consumption of Contaminated Baby Foods rendered the foods carelessly manufactured, dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner.

195. Defendants knew or, by the exercise of reasonable care should have known, ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of exposure to Toxic Heavy Metals from consumption of Contaminated Baby Foods.

196. Without limitation, examples of the manner in which Defendants breached their duty to exercise reasonable care in manufacturing Contaminated Baby Foods includes:

> A. Failure to adequately inspect/test the Contaminated Baby Foods, and their ingredients, during and after the manufacturing process;
>
> B. Failure to implement procedures that would reduce or eliminate Toxic Heavy Metals in baby foods;
>
> C. Failure to investigate suppliers and ingredient sources to reduce and eliminate the risk of ingredients containing Toxic Heavy Metals; and
>
> D. Failure to avoid using ingredients free from, or which contain far less, Toxic Heavy Metals to manufacture baby food.

71

197. A reasonable manufacturer under the same or similar circumstances would have implemented appropriate manufacturing procedures to better ensure the quality and safety of their product.

198. Plaintiff was harmed directly and proximately by Defendants' failure to use reasonable care in the manufacture of their Contaminated Baby Foods. Such harm includes exposure to Toxic Heavy Metals, which can cause or contribute to interference with early neurodevelopment which manifests as ASD, ADHD, and related sequalae.

199. Defendants' improper manufacturing of Baby Foods was willful, wanton, malicious, and conducted with reckless disregard for the health and safety of consumers of the Contaminated Baby Foods, including Plaintiff.

200. The defects in Defendants' Contaminated Baby Foods were substantial factors in causing Plaintiff's injuries.

201. As a direct and proximate result of Defendants' improper manufacturing of Contaminated Baby Foods, Plaintiff has been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss, and damages, including, but not limited to, past and future medical expenses, lost income, and other damages.

**WHEREFORE**, Plaintiff respectfully requests this Court enter judgment in Plaintiff's favor for damages, together with interest, costs herein incurred,

attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT VI: NEGLIGENCE
## PRODUCT DESIGN

202.   Plaintiff adopts and incorporates by reference all allegations contained in paragraphs 1 through 131 above.

203.   Defendants knew or, by the exercise of reasonable care should have known, ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Contaminated Baby Foods.

204.   Defendants owed a duty to all reasonably foreseeable consumers to design a safe product.

205.   Defendants breached their duty by failing to use reasonable care in the design of Contaminated Baby Foods because the products exposed babies to Toxic Heavy Metals.

206.   Defendants breached their duty by failing to use reasonable care in the design of Contaminated Baby Foods by negligently designing the foods with ingredients and/or components contaminated with Toxic Heavy Metals.

207.   Defendants breached their duty by failing to use reasonable care in the design of Contaminated Baby Foods by negligently designing and formulating, in one or more of the following ways:

73

A. When placed in the stream of commerce, Defendants' Contaminated Baby Foods were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate;

B. When placed in the stream of commerce, Defendants' Contaminated Baby Foods were unreasonably dangerous in that they were hazardous and posed a risk of neurodevelopmental disorders and other serious illnesses when used in a reasonably anticipated manner;

C. When placed in the stream of commerce, Defendants' Contaminated Baby Foods contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

D. Defendants did not sufficiently test, investigate, or study their Contaminated Baby Foods and, specifically, the content of Toxic Heavy Metals in the ingredients used to manufacture the foods and/or the finished products;

E. Defendants did not sufficiently test, investigate, or study their Contaminated Baby Foods and, specifically, the ability for those foods to expose babies to Toxic Heavy Metals; and

F. Exposure to the Toxic Heavy Metals in Contaminated Baby Foods

74

presents a risk of harmful effects that outweigh any potential utility stemming from the use of the products;

208.  Defendants knew or should have known at the time of marketing Contaminated Baby Foods that exposure to Toxic Heavy Metals contained in the baby foods could result in interference with early neurodevelopment that that manifests as ASD, ADHD, and related sequalae.

209.  Defendants, by design, did not conduct adequate post-marketing surveillance of their Contaminated Baby Foods.

210.  Defendants could have employed safer alternative designs and formulations.  For example, Defendants could have avoided use of certain ingredients contaminated with Toxic Heavy Metals, avoided using pre-mix vitamins contaminated with Toxic Heavy Metals, and/or sampled their ingredients from other sources.

211.  Defendants breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs.  There was a practical, technically feasible, and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendants' Contaminated Baby Foods.

212.  A reasonable company under the same or similar circumstances would have designed a safer product.

75

213.   Plaintiff was harmed directly and proximately by Defendants' failure to use reasonable care in the design of their Contaminated Baby Foods.  Such harm includes exposure to Toxic Heavy Metals, which can cause or contribute to interference with neurodevelopment that manifests as ASD, ADHD, and related sequalae.

214.   Defendants' defective design of Contaminated Baby Foods was willful, wanton, malicious, and conducted with reckless disregard for the health and safety of consumers of the baby foods, including Plaintiff.

215.   The defects in Defendants' Contaminated Baby Foods were substantial factors in causing Plaintiff's injuries.

216.   As a direct and proximate result of Defendants' negligent design of the Contaminated Baby Foods, Plaintiff has been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss, and damages, including, but not limited to, past and future medical expenses, lost income, and other damages.

**WHEREFORE**, Plaintiff respectfully requests this Court enter judgment in Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT VII: GENERAL NEGLIGENCE

217.  Plaintiff adopts and incorporates by reference all allegations contained in paragraphs 1 through 131 above.

218.  Plaintiff pleads claims for negligence under all theories that may be actionable under any applicable state laws.

219.  Defendants owed Plaintiff a duty to act with reasonable care, including the following:

A.  Defendants owed a duty because they distributed and promoted their products as safe for children to consume;

B.  Defendants owed a duty because their conduct created a risk of harm to Plaintiff and caused Plaintiff actual harm;

C.  Defendants owed a duty because the risk of harm to Plaintiff was embedded in, and an inherent component of, their negligent business practices; and

D.  Defendants owed a duty because they designed, manufactured, controlled, distributed, and sold their products to Plaintiff.

220.  Defendants breached their duty to Plaintiff by designing, manufacturing, selling, distributing, and promoting their Contaminated Baby Foods, even though they contained Toxic Heavy Metals.

221.  Defendants' negligence includes, but is not limited to, their marketing,

designing, manufacturing, producing, supplying, inspecting, testing, selling, and/or distributing Contaminated Baby Foods in one or more of the following respects:

A. Failure to implement procedures that would reduce or eliminate Toxic Heavy Metals in baby foods;

B. Failure to investigate suppliers and ingredient sources to reduce and eliminate the risk of ingredients containing Toxic Heavy Metals;

C. Failure to avoid using ingredients free from, or which contain far less, Toxic Heavy Metals to manufacture baby food;

D. When placed in the stream of commerce, Defendants' Contaminated Baby Foods were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate;

E. When placed in the stream of commerce, Defendants' Contaminated Baby Foods were unreasonably dangerous in that they were hazardous and posed a risk of neurodevelopmental disorders and other serious illnesses when used in a reasonably anticipated manner;

F. When placed in the stream of commerce, Defendants' Contaminated Baby Foods contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

78

G. Defendants, by design, did not conduct adequate post-marketing surveillance of their Contaminated Baby Food products which would have alerted the public to risks;

H. Defendants did not sufficiently test, investigate, or study their Contaminated Baby Foods and, specifically, the ability for those foods to expose babies to Toxic Heavy Metals;

I. Defendants could have employed safer alternative designs and formulations for Contaminated Baby Foods, such as ensuring the baby food did not have any detectable level of Toxic Heavy Metal;

J. Defendants did not sufficiently test, investigate, or study their Contaminated Baby Foods and, specifically, the content of Toxic Heavy Metals in the ingredients used to manufacture the foods and/or the finished products; and

K. Exposure to the Toxic Heavy Metals in Contaminated Baby Foods presents a risk of harmful effects that outweigh any potential utility stemming from the use of the products.

222. Defendants knew or should have known that their products contained detectable levels of Toxic Heavy Metals that created an unreasonable risk of harm to children who consumed their products.

223. At all relevant times, Defendants knew or should have known that the

79

Products were unreasonably dangerous and defective when put to their reasonably anticipated use.

224.    As a proximate result of Defendants' negligence, Plaintiff has been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss, and damages, including, but not limited to, past and future medical expenses, lost income, and other damages.

**WHEREFORE**, Plaintiff respectfully requests this Court enter judgment in Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff requests that the Court enter judgement in Plaintiff's favor and against Defendants for:

      A. actual or compensatory damages in such amount to be determined at trial and as provided by applicable law;

      B. exemplary and punitive damages sufficient to punish and deter Defendants and others from future wrongful practices;

      C. pre-judgment and post-judgment interest;

      D. costs including reasonable attorneys' fees, court costs, and other litigation expenses; and

E.  any other relief the Court may deem just and proper.

## **JURY TRIAL DEMAND**

Plaintiff demands a trial by jury on all triable issues within this pleading.

Dated: May 1, 2026                    Respectfully submitted,


/s/ Eli Hare
Eli Hare
Florida Bar No.: 1021401
**DiCello Levitt LLP**
505 20th Street North
Suite 1500
Birmingham, Alabama 35203
Tel. 205.855.5700
ehare@dicellolevitt.com

***Attorney for Plaintiff***

81